UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff-Appellee, ) <br> ) <br> v. ) <br> ) <br> ERIC J. MONTGOMERY, ) <br> ) <br> Defendant-Appellant, ) <br> _____ ) | NO. CR-F-04-5160 AWI <br> Mag. No. 03-2249 <br><br> ORDER RE: APPEAL OF MOTION TO SUPPRESS EVIDENCE |

This matter is before the court on an appeal of a Magistrate Judge's denial of a motion to suppress evidence in a misdemeanor criminal case.

**I. History**

The Bureau of Land Management ("BLM") operates three federal recreation areas ("Areas") on the banks of the Kaweah River in Tulare County. North Fork Drive provides access to a number of private residences and the Areas; the road is not a throughway and ultimately ends in Sequoia National Park after passing the entrances to the Areas. Residents nearby complained of criminal activities and littering. Upon inspection, the BLM found evidence of gang activity, littering, sale of narcotics, underage consumption of alcohol, and disregard for fire safety. The BLM state director promulgated supplemental rules pursuant to 43 C.F.R § 8365.1-6 which (among other things) prohibited the possession and/or consumption of alcohol in the Areas. Various regulations were posted in the Areas and on North Fork Drive. Sometime in 2001, chief

ranger Edward James Ruth authorized the set-up of a checkpoint on North Fork Drive ("Checkpoint"), which visitors hit before reaching the official entrance of the first of the Areas.[1] The Checkpoint consisted of a ranger vehicle, stop sign, and traffic cone. Due to the topography of the road, it is unlikely that a driver would be able to see the Checkpoint and avoid it by turning around. Doc. 24, Transcript, at 41:10-13. Ruth stated that the Checkpoint was put up when use of the Areas was expected to be high (weekends, holidays, etc.). According to him, the "[p]rimary intent of the information station was to provide people information as to what the regulations were in the area and to answer any questions that they might have." Doc. 24, Transcript, at 25:1-3. At the Checkpoint, all vehicles are stopped. Ruth estimates that the average stop takes 15-20 seconds. Doc. 24, Transcript, at 29:2-3. The rangers inform the occupants about various regulations that apply in the Areas and give them a litter bag printed with rules prohibiting littering, wood fires, camping, target shooting, and alcohol. Doc. 36, Ex. B. They often ask occupants whether they are carrying alcohol. Doc. 24, Transcript, at 23:14-15. Ruth states that occupants are given the options of pouring the alcohol out, leaving the alcohol with the rangers (to be picked up at the time they exit), or turning around. Doc. 24, Transcript, at 23:12-20. Ruth did admit that citations were issued at the Checkpoint when occupants denied that they had alcohol when it was in plain sight. Doc. 24, Transcript, at 29:17-30:4. There were no written guidelines; no formal training on how to conduct the stops was implemented. Doc. 24, Transcript, at 30:12-22. The other rangers (of which there are three) were told by Ruth to follow his example. Doc. 24, Transcript, at 45:8-20.

On June 8, 2003, Eric J. Montgomery ("Defendant") drove a car owned by Peaches Lee Tsocheff on North Fork Drive toward the Areas. The car contained two passengers, Peaches Lee Tsocheff and Michelle Case. On that day, Ruth and ranger Patrick Appley were manning the

---

[1]While the checkpoint is on federal land, it is not within the bounds of the Areas themselves. Doc. 36, US's Brief, at 14:19-22. The entrance to the first Area is visible from the checkpoint. Doc. 24, Transcript, at 26:20-27:1. All private residences on North Fork Drive are located on the road before reaching the checkpoint; from that point on, the road only provides access to the Areas before ending in Sequoia National Park.

Checkpoint. It was Appley's first day conducting stops. Doc. 24, Transcript, at 63:11-15. At the stop, Appley smelled alcohol coming from within the passenger compartment through the open window. Doc. 24, Transcript, at 55:5-10. He asked Defendant if they were carrying any alcohol and Defendant answered in the affirmative. Appley walked to the rear of the vehicle to look at the license plate, claiming that this was his usual "practice when I feel that there is something wrong, to look at the rear license plate." Doc. 24, Transcript, at 70:19-20. He claims that the year sticker on the license plate was "curled up and peeling off the license plate" which in his experience meant that "it's stolen or does not belong to that vehicle." Doc. 24, Transcript, at 56:4 and 56:6-7. Appley asked Defendant to pull the car over to the side. Appley had the occupants exit the car and asked for consent to search the car which was given. Defendant also states that Appley asked if they had any illegal narcotics. Doc. 24, Transcript, at 8:21-23. In the car, Appley discovered three open beer containers. He asked all three occupants for identification and ran background checks. Defendant's license had been suspended for a DUI. At some point, Appley did ask Defendant whether he had been drinking. Doc. 24, Transcript, at 69:18-21. Appley cited all occupants for possession of open containers and Defendant for driving with a suspended license. Appley allowed Peaches Lee Tsocheff to drive the vehicle. The stop took approximately 30 minutes.

On July 23, 2003, Defendant was charged with violating 43 C.F. R. § 8341.1(d) (operation of an off road vehicle in violation of state law) under California Vehicle Code § 14601.2(a) (driving with a license suspended or revoked for driving under the influence) and California Vehicle Code § 23223(a) (driver in possession of an open alcoholic beverage). Defendant waived his right to proceed before a District Court Judge, consenting to the jurisdiction of the Magistrate Judge. Doc. 6, September 17, 2003. Defendant then made a motion to suppress all evidence gathered as a result of the stop. Doc. 8, October 30, 2003. Defendant argued that his Fourth Amendment rights were violated as the checkpoint was unconstitutional. The United States filed a brief in opposition. Doc. 11, December 5, 2003. A hearing was held on January 14, 2004.

The Magistrate Judge issued an order on February 23, 2004 denying the motion. Doc. 18.

Specifically, he found that the primary purpose of the Checkpoint was to inform users of the Area of the applicable rules and regulations.  The Magistrate Judge also found that once Appley smelled the odor of alcohol, he had probable cause to detain for investigation.  Defendant appealed the denial to the District Court. Doc. 27, June 15, 2004.  Defendant filed a brief on September 17, 2004. Doc. 34.  The United States filed an opposing brief on October 25, 2004. Doc. 36.

Meanwhile, Defendant reached a plea agreement with the United States and plead guilty to both charges while reserving the right to appeal. Doc. 23, March 26, 2004.  Defendant was sentenced to 12 months probation, a $50 penalty assessment, drug/alcohol testing, and 125 hours of community service to be completed within 8 months. Doc. 25, June 10, 2004.  Defendant then violated the terms of his probation.  On November 19, 2004, the U.S. Probation Office filed a 12c form with the Magistrate Judge seeking a warrant for Defendant's arrest, charging that: (1) Defendant failed to report a change of address, (2) Defendant's urine collected on June 14, 2004 tested positive for amphetamine, methamphetamine, and marijuana, (3) Defendant failed to show up for drug tests from July 2004 on, (4) Defendant had not yet done any community service, and (5) Defendant failed to submit written reports to his probation officer from August 2004 on. Doc. 37.  The Magistrate Judge granted the request and issued an arrest warrant.  Defendant was detained and plead guilty to charges 2 through 5; charge 1 was dismissed.  On May 5, 2005, the Magistrate Judge sentenced Defendant to 90 days imprisonment.

## II. Legal Standards

Motions to suppress are reviewed de novo. United States v. Meek, 366 F.3d 705, 711 (9th Cir. 2004).  The trial court's factual findings are reviewed for clear error. United States v. Bynum, 362 F.3d 574, 578 (9th Cir. 2004).  Review under the clearly erroneous standard is significantly deferential, requiring a "definite and firm conviction that a mistake has been committed." United States v. Doe, 155 F.3d 1070, 1074 (9th Cir. 1998) (en banc); see Easley v. Cromartie, 532 U.S. 234, 242 (2001).

### III. Discussion

Defendant asserts that the Checkpoint at which Defendant was stopped was invalid in light of U.S. Supreme Court precedent in Indianapolis v. Edmond, 531 U.S. 32 (2000); Brown v. Texas, 443 U.S. 47 (1979); and Illinois v. Lidster, 540 U.S. 419 (2004). Defendant does not challenge the Magistrate Judge's finding that Appley had probable cause to detain once he smelled the presence of alcohol coming from the car.

**A. The Edmond and Lidster Checkpoint Models**

"[A] Fourth Amendment 'seizure' occurs when a vehicle is stopped at a checkpoint." Mich. Dep't of State Police v. Sitz, 496 U.S. 444, 450 (1990). "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." Indianapolis v. Edmond, 531 U.S. 32, 37 (2000) (citing Chandler v. Miller, 520 U.S. 305, 308 (1997)). In Edmond, the U.S. Supreme Court dealt with a suit seeking declaratory and injunctive relief against a "highway checkpoint program whose primary purpose is the discovery and interdiction of illegal narcotics." Indianapolis v. Edmond, 531 U.S. 32, 34 (2000). In finding the checkpoint violated motorists' constitutional rights, the court established a general rule that a checkpoint is unconstitutional when its "primary purpose was to detect evidence of ordinary criminal wrongdoing....each of the checkpoint programs that we have approved was designed primarily to serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety." Indianapolis v. Edmond, 531 U.S. 32, 41 (2000). Only under "limited circumstances....where the program was designed to serve special needs, beyond the normal need for law enforcement" have the courts ruled that checkpoints may be used. Indianapolis v. Edmond, 531 U.S. 32, 37 (2000) (citations omitted). In the absence of special circumstances, the requirement of individualized suspicion holds, rendering checkpoints unconstitutional. The courts subsequently described Edmond as establishing a presumption of unconstitutionality for checkpoints. See Illinois v. Lidster, 540 U.S. 419, 424 and 426 (2004) ("*Edmond*-type rule of automatic unconstitutionality" and "*Edmond*-type presumptive rule of unconstitutionality").

The decision in Edmond recognized that checkpoint stops are constitutional in the context of two special needs: national border control and highway safety. Indianapolis v. Edmond, 531 U.S. 32, 38-39 (2000). The Fifth Circuit summarized the jurisprudence as: "First, the protection of the nation's military installations from acts of domestic or international terrorism is a unique endeavor, akin to the policing of our borders, and one in which a greater degree of intrusiveness may be allowed. Second, those cases focusing not on unique, national challenges, but instead on road safety, are concerned with dangers specifically associated with vehicles and therefore justify suspicionless checkpoint seizures." United States v. Green, 293 F.3d 855, 859 (5th Cir. 2002).

Recently, the U.S. Supreme Court has articulated a new type of special need[2] based on a different checkpoint model. When a checkpoint is set up "*not* to determine whether a vehicle's occupants were committing a crime, but to ask vehicle occupants, as members of the public, for their help in providing information about a crime in all likelihood committed by others," Edmond's automatic unconstitutionality does not apply. Illinois v. Lidster, 540 U.S. 419, 423 (2004) (emphasis in the original). In that case, the police had set up a checkpoint at the site of a hit and run that occurred the previous week. Police asked drivers if they had any information about the accident and distributed a flyer requesting that anyone having knowledge contact the police department. Illinois v. Lidster, 540 U.S. 419, 422 (2004). An individual approaching the checkpoint was driving erratically. When stopped, the officer smelled alcohol and administered a sobriety test. The driver was ultimately arrested for driving under the influence and challenged his conviction on the basis that the checkpoint violated his Fourth Amendment rights. The court denied the driver's claims, finding the checkpoint constitutional.

**B. Primary Purpose**

For the purpose of determining the constitutionality of any checkpoint, the courts look at

---

[2]Though the Lidster opinion itself does not state that the checkpoint in question served a "special need," the Ninth Circuit has discussed the case in the context of "special needs." United States v. Kincade, 379 F.3d 813, 854 (9th Cir. 2004) (describing Lidster as "upholding a suspicionless traffic stop under the special needs doctrine...").

6

the "primary law enforcement purpose." See Illinois v. Lidster, 540 U.S. 419, 423 (2004) (discussing the primary goal of the checkpoint in Lidster). "For this reason, we examine the available evidence to determine the primary purpose of the checkpoint program." Indianapolis v. Edmond, 531 U.S. 32, 46 (2000). The United States argues that "[t]he primary reason BLM initiated an information station near their entrance was to educate and inform the visitors to the area" of the rules for the recreation area. Doc. 36, US's Brief, at 13:2-4. As a factual matter, the Magistrate Judge determined that "[f]irst and foremost, the purpose of the stops at the 'mobile visitor's station' was to inform users of the BLM recreation area of the rules, in particular the rules requiring proper disposal of trash and against possession of alcohol, and to demonstrate a law enforcement presence for the purpose of enforcing those rules. Unlike most of the other Supreme Court cases dealing with checkpoints, the purpose was not to uncover evidence of violations of the law." Doc. 18, Magistrate's Order, at 4:18-22. A determination as to the primary purpose of a checkpoint is a matter of fact, reviewed for clear error. See United States v. Green, 293 F.3d 855, 859 (5th Cir. 2002); United States v. Davis, 270 F.3d 977, 980 (D.C. Cir. 2001).

      Defendant argues that the Checkpoint must be evaluated under Edmond as it was set up in order to effectuate general crime control. Doc. 34, Def.'s Brief, at 9:4-5. Referring to testimony from the suppression hearing and the United States' brief to the Magistrate Judge, Defendant points out that individuals were actually cited at the Checkpoint and that deterring violations of the regulations was the motivation behind its creation. Doc. 24, Def.'s Brief, at 8:17-23. "Clearly, the purpose (or at least one of the main purposes) behind the creation of and reason for maintaining the BLM checkpoint was/is to address criminal wrongdoing." Doc. 34, Def.'s Brief, at 9:3-4. While the court agrees that actually intercepting alcohol was one of the purposes of the Checkpoint, there is insufficient proof to show that the Magistrate Judge's conclusion as to the primary purpose constitutes clear error. The testimony of Ruth and the fact that special litter bags printed with Area regulations were passed out at the Checkpoint offer evidence that support the Magistrate Judge's finding.

      The analysis must first be limited to an evaluation of the identified primary purpose. As

in Lidster, the rangers at the Checkpoint passed on information to and gathered information from people passing through. In Lidster, the U.S. Supreme Court stated that "unlike *Edmond*, the context here (seeking information from the public) is one in which, by definition, the concept of individualized suspicion has little role to play. Like certain other forms of police activity, say, crowd control or public safety, an information-seeking stop is not the kind of event that involves suspicion, or lack of suspicion, of the relevant individual. For another thing, information-seeking highway stops are less likely to provoke anxiety or to prove intrusive. The stops are likely brief. The police are not likely to ask questions designed to elicit self-incriminating information." Illinois v. Lidster, 540 U.S. 419, 424-25 (2004). In promoting awareness of the Area rules, there was no intent to apprehend individuals and little reason for individuals stopped to feel anxious. As the Magistrate Judge pointed out, in providing information about the rules, the situation is akin to "entering a National Park where rangers are posted at a fixed entry station to collect fees, provide information to visitors and remind them of the park rules and regulations." Doc. 18, Magistrate's Order, at 5:7-9. As the Checkpoint is akin to that in Lidster, it's primary purpose is constitutional in light of the precedents in Lidster and Edmond.

**C. Secondary Purpose**

Edmond reserved the issue of whether an invalid secondary purpose renders a checkpoint unconstitutional when the primary purpose is valid. Indianapolis v. Edmond, 531 U.S. 32, 47 n.2 (2000). While the Ninth Circuit has been silent on the issue, the Fifth Circuit has taken the position that once law enforcement goes beyond the primary purpose to the invalid secondary purpose, a Fourth Amendment violation occurs. In a case concerning a checkpoint for immigration control, the Fifth Circuit found "[w]e have no doubt that the primary purpose of the Sierra Blanca checkpoint is to investigate immigration status. The fact that an initial stop at the checkpoint is constitutional, however, does not leave us free to ignore the unconstitutionality of suspicionless detentions designed to intercept drug traffickers." United States v. Portillo-Aguirre, 311 F.3d 647, 655 (5th Cir. 2002). In explaining the bounds of Edmond, the Fifth Circuit has stated that "[t]he permissible duration of the stop is limited to the time reasonably necessary to

complete a brief examination of the matter within the scope of the stop" and "questioning unrelated to the justification for the stop that extends the duration of the stop violates the Fourth Amendment." United States v. Machucha-Barrera, 261 F.2d 425, 433 and 432 n.21 (5th Cir. 2001). This analysis is distinct from the requirement that courts conduct a searching review to identify the true primary purpose of a checkpoint notwithstanding the law enforcement agency's representations. Indianapolis v. Edmond, 531 U.S. 32, 46-47 (2000). The Fifth Circuit explains that marrying an invalid secondary purpose to a concededly valid primary purpose would allow law enforcement to circumvent Edmond. United States v. Portillo-Aguirre, 311 F.3d 647, 655 (5th Cir. 2002). Other courts appear to be sympathetic to this analytical approach. See U.S. v. Huguenin, 154 F.3d 547, 558 (6th Cir. 1998) (in discussing mixed motive checkpoints, the court disapproved of questions extraneous to the permissible purpose of stopping drunk driving).

Though the Magistrate Judge made no factual findings on this matter, the evidence clearly shows that a secondary purpose of the Checkpoint is to interdict alcohol. While the primary purpose of providing information about Area rules falls under the Lidster special need, the secondary purpose does not. In reaching this conclusion, the court looks at the public policy rationales underlying the distinction between Lidster and standard checkpoint. Again, the key distinction is that "unlike *Edmond*, the context here (seeking information from the public) is one in which, by definition, the concept of individualized suspicion[3] has little role to play. Like certain other forms of police activity, say, crowd control or public safety, an information-seeking stop is not the kind of event that involves suspicion, or lack of suspicion, of the relevant individual. For another thing, information-seeking highway stops are less likely to provoke anxiety or to prove intrusive. The stops are likely brief. The police are not likely to ask questions

---

[3]Despite the disclaimer in Lidster, the U.S. Supreme Court in Edmond terms all checkpoint stops as "suspicionless seizures." Indianapolis v. Edmond, 531 U.S. 32, 37 (2000). In Edmond, "suspicionless" appears to mean the lack of any specific information that the individual stopped is culpable. In this sentence, the court seems to define the lack of "individualized suspicion" as the fact that officers do not generally conceive of the individuals stopped at the checkpoint as potentially having broken any laws. In Edmond, officers approach motorists stopped at the checkpoint with the preconceived notion that the individual may have done some wrong.

designed to elicit self-incriminating information." Illinois v. Lidster, 540 U.S. 419, 424-25 (2004). "The police expected the information elicited to help them apprehend, not the vehicle's occupants, but other individuals." Illinois v. Lidster, 540 U.S. 419, 423 (2004).

At the Checkpoint, the targets of the information gathering were the occupants of the vehicles themselves. The stop involved suspicion that the occupants themselves were involved in prohibited activity. Adopting Lidster's use of the term, there was "individualized suspicion" at work. The officers suspected that the vehicles on the road carried alcohol.[4] Appley stated that he would "ask if they [visitors] have alcohol in the vehicle" as a matter of course. Doc. 24, Transcript, at 53:3-8. By routinely asking if the occupants carried alcohol, the BLM rangers were asking a question that lead to self-incriminating information. Lidster reasoned that the special circumstance whereby law enforcement asked individuals for help in solving a crime wholly

---

[4]There is quite a deal of factual uncertainty in this case concerning the BLM rangers' authority to cite drivers for having alcohol in closed containers at the Checkpoint. The text of the supplementary rules states: "FEDERAL REGULATIONS ENFORCED AT ALL RECREATION AREAS ON NORTH FORK DRIVE:......8. Possession or consumption of alcoholic beverages such as beer, wine or liquor is prohibited." The United States clearly stated that the Checkpoint was "set upon public federal land and prior to the recreation area." Doc. 36, US's Brief, at 14:20:22. There is no indication that possession of alcoholic beverages in vehicles on North Shore Drive outside the Areas constitutes any sort of violation.

Aside from regulations pertaining to the Areas, possession of alcohol on federal land is not generally prohibited. The only relevant regulations the court has found state that "No person shall operate an off-road vehicle on public lands:....While under the influence of alcohol, narcotics, or dangerous drugs." 43 C.F.R. § 8341.1(f) and 43 C.F.R. § 9268.3(a)(2)(vii). These regulations would not justify the citations issued. It is unclear what the BLM and its rangers have told the visitors at the Checkpoint. It is unclear whether BLM rangers have a different interpretation of the regulation; Ruth states that alcohol is "prohibited on BLM lands on North Fork Drive." Doc. 24, Transcript, at 29:6.

It is clear from the testimony at the suppression hearing that the rangers cited drivers who possessed closed alcoholic beverages (regardless of whether they had the authority to do so). When asked how many citations he issued for possession of alcohol on June 8, 2003, Appley estimates he "wrote 15 tickets that day. Maybe a quarter of them were open container tickets." Doc. 24, Transcript, at 76:19-21. The other three quarters were presumably issued for violations of the supplementary regulations prohibiting alcohol in the recreation areas. As the BLM treated alcohol possession at the Checkpoint as a violation of regulations, the court makes the same assumption for determining the constitutionality of the Checkpoint.

unconnected with those individuals would not raise the sort of antagonistic tensions present when an individual feels that he/she is under suspicion.  In contrast, Edmond dealt with the "generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime." Indianapolis v. Edmond, 531 U.S. 32, 44 (2000). Such is the case with the checkpoint at issue: the BLM was targeting visitors because of the apparently well-founded suspicion that many of them were violating recreation area regulations. The Ninth Circuit has found that "valid special needs, as the Court most recently explained in *Lidster*, may not include efforts to obtain information related to possible crimes that the searched individual may have committed." United States v. Kincade, 379 F.3d 813, 855 (9th Cir. 2004). The interaction between law enforcement and the motorist more closely resembles that of Edmond rather than Lidster.  On balance, the secondary purpose does not fall under the Lidster special need exception.

There is no indication that enforcing federal regulations on recreation land falls under any other special need sufficient to justify an exception to the Edmond automatic unconstitutionality rule.  Regulating alcohol use, fire safety, and the like is not akin to national border control or highway safety.  The United States cites a case from the Eighth Circuit which dealt with a checkpoint set up by the National Park Service. Doc. 36, US's Brief, at 13:26-14:1.  In that case, the court declined to establish a general rule that any "checkpoint on a forest road is illegal *per se*." Tracie Park v. Forest Serv. of the United States, 205 F.3d 1034, 1040 (8th Cir. 2000).  The case does not address the special needs analysis as the suit was dismissed on standing.  The United States has not provided any case law that would support a finding that the Checkpoint falls under a special purpose.  In an old case regarding the rights of individuals who reside within a national park, one federal court did state "[t]here is no violation of any right of the plaintiffs in the maintenance of a checkpoint. This is within the police power of the United States and within the powers ceded to it by the State of Florida over park lands owned by the United States. No undue hardship or burden is cast upon the plaintiffs." Halpert v. Udall, 231 F. Supp. 574, 578 (S.D. Fla. 1964).  That decision did not deal with Fourth Amendment search and seizure but instead with Fifth Amendment due process and eminent domain.  Halpert has never been cited

for the proposition that checkpoints in national parks or recreation areas located on federal land are constitutional.

However, given the facts of the case, analysis of the second purpose need not be reached. Under the Fifth Circuit's analytical framework, a checkpoint stop does not violate an individual's Fourth Amendment rights if law enforcement confines itself to asking questions related to the valid primary purpose. Only when law enforcement goes beyond the primary purpose to investigate the invalid secondary purpose without sufficient individualized suspicion, does a Fourth Amendment violation occur. United States v. Machucha-Barrera, 261 F.2d 425, 432 n.21 (5th Cir. 2001). This is in contrast with a checkpoint having an invalid primary purpose where the act of stopping motorists itself constitutes a Fourth Amendment violation. On June 8, 2003, Appley approached Defendant at the checkpoint and immediately smelled alcohol. There was no interaction between Appley and Defendant before the ranger's detection of alcohol. The Magistrate Judge determined that a ranger's smelling alcohol emanating from within a motor vehicle constitutes sufficient "probable cause to detain for further investigation." Doc. 18, Magistrate's Order, at 3:1-2. Defendant has not challenged this finding on appeal. Under the facts of this case, there is no evidence that Appley went beyond the valid primary purpose of informing visitors of recreation area regulations before forming an individualized suspicion regarding Defendant which justified his seizure.

**D. Brown v. Texas**

Even when a checkpoint qualifies as a special need under Lidster, the checkpoint must be analyzed for reasonableness under the standards set out in Brown. Illinois v. Lidster, 540 U.S. 419, 426-27 (2004). The balancing test involves three factors: "Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." Brown v. Texas, 443 U.S. 47, 50-51 (1979).

The Magistrate Judge found that the primary purpose of the Checkpoint was to inform visitors of "the rules requiring proper disposal of trash and against possession of alcohol, and to

demonstrate a law enforcement presence." Doc. 18, Magistrate's Order, at 4:18-21.  The public concern in this case can be described more broadly as ensuring the safety of visitors to the Area and preserving the environment of the land.  In addition to explaining that alcohol is not permitted in the Areas, the printed litter bags specifically warn visitors that campfires and target shooting are forbidden as well.  In Lidster, the public concern was "grave. Police were investigating a crime [hit and run] that had resulted in a human death." Illinois v. Lidster, 540 U.S. 419, 427 (2004).  The U.S. Supreme Court has ruled that there is a "vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation." Delaware v. Prouse, 440 U.S. 648, 665 (1979).  The base concern addressed there is highway safety.  As one opinion noted, drunk driving kills 25,000 annually. Mich. Dep't of State Police v. Sitz, 496 U.S. 444, 451 (1990).  In the Areas, the concern over the safety and well being of visitors is most clearly illustrated by the prohibition on target shooting. Though the public concern here is clearly less serious than the concerns in other cases where checkpoints have been found reasonable, it must still be considered.  Furthermore, the gravity of the public concern is not determinative as it must be considered in conjunction with the other factors.

At argument before the Magistrate Judge, the United States admitted that "there is no statistical information regarding the effectiveness of the information station. Doc. 24, Transcript, at 102:15-17.  However, given that the Checkpoint follows the Lidster model, the measure of effectiveness is quite different.  When dealing with checkpoints that actively seek to interdict (drunk drivers or illegal aliens), the effectiveness can be measured as the rate at which law enforcement finds what they are looking for.  The interdiction rate in Michigan v. Sitz (drunk driving) was 1.6% and the rate in Martinez-Fuerte (illegal immigration) was .5%.  With Lidster, the court looked instead at the design of the checkpoint, and whether it was well-tailored to addressed the public concern without regard to statistics. See Illinois v. Lidster, 540 U.S. 419, 427 (2004).  The Checkpoint was placed just outside the entrances to the Areas.  Based on the fact that North Shore Drive ended after passing the Areas, it is fair to say that all individuals reaching the Checkpoint were bound for the Areas.  Rangers discussed the regulations applicable

in the Areas and distributed litter bags printed with the rules they wanted visitors to learn.  The Checkpoint is well designed to achieve its purpose.

As for interference with liberty interests, there are two concerns: "The privacy intrusion must be measured in terms of both the objective intrusion (i.e., the stop, the questioning, and the visual inspection) and the subjective intrusion (i.e., the generating of concern or fright on the part of lawful travelers)." U.S. v. Munoz, 701 F.2d 1293, 1297 (9th Cir. 1983).  The fact that most stops are 15-20 seconds long demonstrates that the objective intrusion is light.  In comparing border control checkpoints and highway sobriety checkpoints, the U.S. Supreme Court found that it was duration of stop rather than type of questioning that determined the intrusiveness of the stop. Mich. Dep't of State Police v. Sitz, 496 U.S. 444, 451-452 (1990). ("We see virtually no difference between the levels of intrusion on law-abiding motorists from the brief stops necessary to the effectuation of these two types of checkpoints, which to the average motorist would seem identical save for the nature of the questions the checkpoint officers might ask.").  In Sitz, the average stop lasted 25 seconds. Mich. Dep't of State Police v. Sitz, 496 U.S. 444, 448 (1990).  Drivers stopped at the Checkpoint face a similar level of intrusion (15-20 seconds), which may justifiably be termed "slight." Mich. Dep't of State Police v. Sitz, 496 U.S. 444, 451-452 (1990).

Relative to the subjective intrusion, Defendant argues that drivers on North Fork Drive were given no warning that they were coming upon any checkpoint until they were stopped. Doc. 34, Def.'s Brief, at 12:10-11.  Ruth admits that prior to coming around a turn, there is no indication to a driver that he/she is coming to the Checkpoint. Doc. 24, Transcript, at 41:10-13.  The distance from the turn to the Checkpoint is approximately one eighth of a mile. Doc. 5, Transcript, at 5:12-14.  Defendant testified that the Checkpoint was just a ranger vehicle off the side of the road and that he did not even realize it was a checkpoint until Appley stepped out in front of the car he was driving. Doc. 24, Transcript, at 5:20-24.  The Checkpoint, being intermittent and ad hoc, did not have any sort of permanent structure which would normally have alerted the public to its presence.  Nevertheless, a permanent structure is not necessary to allay the fear and surprise that ordinarily accompanies a law enforcement stop.  "[T]he circumstances

surrounding a checkpoint stop and search are far less intrusive than those attending a roving-patrol stop. Roving patrols often operate at night on seldom-traveled roads, and their approach may frighten motorists. At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion." United States v. Ortiz, 422 U.S. 891, 894-95 (1975). "The 'fear and surprise' to be considered are not the natural fear of one who has been drinking over the prospect of being stopped at a sobriety checkpoint but, rather, the fear and surprise engendered in law abiding motorists by the nature of the stop." Mich. Dep't of State Police v. Sitz, 496 U.S. 444, 452 (1990). As in Sitz, the rangers stopped every car at the Checkpoint, which should decrease the anxiety of individuals stopped as it allays their fear that the rangers are singling them out due to some suspicion. Even though Defendant may not have realized this fact (as it appears that there were no other vehicles in the vicinity when he was stopped), his fear and surprise should have been minor. With a roving patrol where a law enforcement officer pulls over a vehicle, the driver will likely think that they have done something wrong, that there is individualized suspicion. Here, Appley was on foot with his truck stopped on the side of the road. Defendant should have had no reason to think that Appley had individualized suspicion.

Brown requires that the "seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." Brown v. Texas, 443 U.S. 47, 51 (1979) (citations omitted). Defendant points out that the officers at the checkpoint did not have clear rules to guide their actions. Doc. 34, Def.'s Brief, at 11:22-23. In a case involving roving patrols, the U.S. Supreme Court found fault with the exercise of "standardless and unconstrained discretion." Delaware v. Prouse, 440 U.S. 648, 661 (1979). However, the court then opined that "[q]uestioning of all oncoming traffic at roadblock-type stops is one possible alternative" which would solve the problem. Delaware v. Prouse, 440 U.S. 648, 663 (1979). Indeed, the United States argues that because "every car is stopped at the information station" there is no danger of "discriminatory or an unconstrained exercise of discretion" in this case. Doc. 36, US's Brief, at 11:13-15. As for the degree of discretion a law enforcement officer can exercise once a vehicle has been stopped, case law suggests that law enforcement officers are

given wide discretion in further pursuing their inquiry. See <u>Immigration & Naturalization Service v. Delgado</u>, 466 U.S. 210, 224 (1984) (Powell, J., concurring) (taking note of "the virtually unlimited discretion to refer cars to the secondary inspection area that we approved in <u>Martinez-Fuerte</u>.").

The circumstances of this case make for a very close call regarding reasonableness. Though the public concern is of limited seriousness, the Checkpoint is well designed to advance its primary purpose and imposes a minimal intrusion on liberty interests. On balance, the Checkpoint is reasonable under the <u>Brown</u> standard.

### IV. Conclusion

Defendant's appeal of the Magistrate Judge's decision is DENIED.

IT IS SO ORDERED.

**Dated:   July 5, 2005**            **/s/ Anthony W. Ishii**
0m8i78                                   UNITED STATES DISTRICT JUDGE